**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARVIN BOBO, | ) | CASE NO.  1:16CV2722 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Marvin Bobo ("Plaintiff" or "Bobo"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) & 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further proceedings consistent with this decision.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In October 2013, Bobo filed applications for POD and DIB, alleging a disability onset

date of July 3, 2013 and claiming he was disabled due to "back problems, herniated disc, pin in

right ankle, reconstructed hip left side, reconstructed pelvis, and high blood pressure."[2]

(Transcript ("Tr.") 10, 159, 175 .)  The applications were denied initially and upon

reconsideration, and Bobo requested a hearing before an administrative law judge ("ALJ").  (Tr.

10, 112-118, 120-125.)

On July 29, 2015, an ALJ held a hearing, during which Bobo, represented by counsel,

and an impartial vocational expert ("VE") testified.  (Tr. 27-58.)  On September 24, 2015, the

ALJ issued a written decision finding Bobo was not disabled.  (Tr. 10-25.)  The ALJ's decision

became final on October 3, 2016, when the Appeals Council declined further review.  (Tr. 2-4.)

On November 8, 2016, Bobo filed his Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 12.)

Bobo asserts the following assignments of error:

(1)    With the misapplication of *Drummond* and *res judicata* principles,
       substantial evidence does not support the ALJ's residual functional
       capacity finding.

(2)    The ALJ did not fulfill her duty to resolve conflicts between the
       Dictionary of Occupational Titles and the Vocational Expert's Testimony.

---

[2] Bobo filed a previous application for POD and DIB on January 11, 2012, alleging a
disability onset date of January 10, 2010.  (Tr. 71.)  Bobo later amended the onset date to
January 1, 2012.  (*Id*.) The applications were denied initially and upon reconsideration,
and Bobo requested a hearing before an administrative law judge ("ALJ").  (*Id*.) On May
20, 2013, an ALJ held a hearing, during which Bobo, represented by counsel, and an
impartial vocational expert ("VE") testified.  (*Id*.)  On July 2, 2013, the ALJ issued a
written decision finding Bobo was not disabled.  (Tr. 71-83.)  Bobo did not appeal this
ALJ decision.  (Tr. 10.)

2

(Doc. No. 11.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Bobo was born in June 1964 and was fifty-one (51) years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations.  (Tr. 20.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has at least a high school education and is able to communicate in English.  (Tr. 20*.*)  He has past relevant work as a laser printer operator, print shop helper, and maintenance housekeeping cleaner.  (*Id*.)

### B.    Relevant Medical Evidence[3]

The record reflects Bobo injured his lower back in 1987 while helping to lift a 500 pound object.  (Tr. 526.)  He felt a "pop" in his back with the onset of severe pain.  (*Id*.)  Since that time, Bobo reported his back pain had progressively worsened, describing it "as a crushing pain feeling like someone standing on his back with radiation to both legs."  (*Id*.)

On April 25, 2013 (just prior to his July 3, 2013 onset date), Bobo underwent an MRI of his lumbar spine.  (Tr. 672-673.)  This MRI revealed the following: (1) a focal annular tear with disc herniation indenting the exiting left-sided nerve root at L4-L5 with moderate right, moderate to severe left neural foramen compromise from disc material and osteophyte; (2) bulging disc and facet hypertrophy causing mild central canal compromise at L3-L4 with moderate bilateral neural foramen compromise; and (3) bulging disc causing mild right, moderate left neural foramen compromise at L1-L2.  (Tr. 673.)

---

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On June 6, 2013, Bobo presented to Urgent Care with complaints of numbness and tingling in his bilateral toes.  (Tr. 377-379.)  He rated his pain a 10 on a scale of 10.  (Tr. 378.)  Nurse Practitioner Kristen Zimbardi advised Bobo to continue his Naproxen, Baclofen, and Tramadol; and added Gabapentin.  (*Id*.)

On July 24, 2013, Bobo began treatment with pain management specialist Kenneth Moss, M.D.  (Tr. 526-527.)  He complained of chronic back pain, numbness and tingling in his toes, neck pain, and tingling in his fingertips.  (*Id*.)  Bobo also indicated his legs "occasionally give out on him when walking."  (*Id*.)  He reported medication and physical therapy had been "somewhat helpful," and stated he had been advised to do home exercises but had not been routinely doing them.  (*Id*.)  Examination of Bobo's lumbar spine revealed limited range of motion, minimal tenderness without evidence of muscle spasm, positive straight leg raise bilaterally with "severe pain radiating into both legs," intact sensation of the lower extremities, normal motor examination, and abnormal reflexes.  (*Id*.)  Examination of Bobo's cervical spine revealed diminished range of motion, normal motor examination, intact sensation to light touch, no trigger points or muscle spasm, and no significant tenderness.  (*Id*.)

Dr. Moss assessed chronic low back pain with multilevel disc degeneration and foraminal stenosis.  (*Id*.)  He ordered a caudal epidural injection, and advised Bobo to return to physical therapy to work on core strengthening and range of motion.  (*Id.*)  Dr. Moss also noted "there does appear to be some sensory deficit" relating to Bobo's cervical spine.  (*Id*.)  He felt an EMG/ nerve conduction study would be a "good first step" and indicated that, if the study was abnormal, he would consider ordering an MRI of Bobo's cervical spine.  (*Id*.)

Bobo underwent a caudal epidural steroid injection at his sacral hiatus on August 19,

4

2013.  (Tr. 489-490.)  On that same date, he was fitted for a back brace.  (Tr. 487.)

On September 4, 2013, Bobo returned to Nurse Practitioner Zimbardi for a follow up.
(Tr. 471-474.)  He reported continuing pain in the back of his bilateral legs and stated he had "no
change in symptoms" since the injection.  (Tr. 472.)  Nurse Zimbardi advised Bobo to continue
his medications.  (Tr. 473.)

Bobo underwent a nerve conduction study ("NCS") of his left arm on September 11,
2013.  (Tr. 467-468.)  It was found to be a "normal limited electrodiagnostic examination based
on the nerve conduction velocity studies only."  (Tr. 468.)  The report indicated Bobo
experienced active muscle spasms, complained of muscle pain, and "did not feel that he could
tolerate the needle portion of the study."  (*Id.*)

On September 23, 2013, Bobo returned to Dr. Moss, complaining of low back pain with
radiation into both legs.  (Tr. 460-461.)  He reported only two weeks of relief from the caudal
injection.  (*Id.*)  Dr. Moss noted Bobo "has virtually no tolerance for any pain and couldn't
complete the EMG/nerve conduction[;] however based on the limited results, there was no
abnormality in the [left] arm."  (*Id.*)  Dr. Moss ordered an MRI of Bobo's cervical spine.  (*Id.*)
He also administered an lumbar epidural steroid injection at L4-L5, and referred him to physical
therapy.  (*Id.*)

Bobo underwent an MRI of his cervical spine on October 26, 2013.  (Tr. 634-635.)  This
MRI revealed the following:

> 1.  Bulging disc causes mild central canal compromise at C3-C4 level.  Disc bulge
> with disc herniation and posterior facet hypertrophy causes moderate to severe
> central canal compromise at C4-C5 level.  Disc bulge with central and left
> paracentral disc herniation causes mild central canal compromise at C5-C6 level.
>
> 2. Osteophytes at the uncovertebral joint cause mild to moderate right, mild left

5

neural foramen compromise at C4-C5 level.  Mild right, moderate left neural foramen compromise from osteophytes at the uncovertebral joint at C5-C6 level.

3.  Osteophytes at the uncovertebral joint cause moderate to severe right, mild left neural foramen compromise at C6-C7 level.

(Tr. 635.)

On December 12, 2013, Bobo presented to physical therapist Thomas Easton, P.T., for a lumbar spine assessment.  (Tr. 670-676.)  Bobo complained of tightness in his lumbar spine, and "throbbing" in his bilateral thighs, calves, and feet.  (Tr. 670.)  Mr. Easton noted Bobo had a slouched posture, wore a lumbar brace to the appointment, and was ambulatory without an assistive device.  (Tr. 673-674.)  He found Bobo had a "poor" prognosis, indicating Bobo did not tolerate the assessment "as basically all lumbar movements and positions will increase complaints 'everywhere.'" (Tr. 675-676.)   Bobo returned to Mr. Easton on December 19, 2013. (Tr. 667-668.)  He indicated he did not believe physical therapy was helping.  (*Id*.)  Bobo complained of worsening numbness and tingling in his legs, as well as neck pain.  (*Id*.)  During this visit, Bobo reported he "got a new cane recently which is helping him walk." (*Id*.)

Bobo returned to Dr. Moss on January 21, 2014.  (Tr. 704-705.)  He stated the injections he received for his low back provided relief for a week and a half, and reported his neck pain was "somewhat worse."  (*Id*.)  Bobo also complained of constant tingling in the C6 and C7 dermatomes, but denied weakness or paralysis.  (*Id*.)  Dr. Moss noted Bobo had no change in his lumbar examination.  (*Id*.)  Examination of his cervical spine showed diminished range of motion, normal motor examination, decreased sensation, and mild tenderness to palpation with evidence of muscle spasms or trigger points.  (*Id*.)  Dr. Moss noted "the EMG nerve conduction study which was attempted last year was nondiagnostic however it had to be aborted before it

was completed due to muscle spasm." (*Id.*)  He discussed the possibility of a cervical epidural steroid injection, but Bobo declined.  (*Id.*)  Dr. Moss referred Bobo to aquatic therapy.  (*Id.*)

Bobo presented for an aquatic therapy assessment on February 20, 2014.  (Tr. 698-701.) He reported that he stayed home most of the day and used a cane for ambulation.  (Tr. 698.) Bobo complained of lower back and cervical pain, as well as tingling in his bilateral arms, which "interfered with sleep, general activity, enjoyment of life, work and mood."  (Tr. 700.)  He rated the pain an 8 on a scale of 10.  (*Id.*)  Bobo also stated he had fallen two to three months previously when his legs gave out, but indicated he had not fallen since obtaining a cane.  (*Id.*) Evaluation revealed poor bilateral lower extremity strength, poor flexibility, tight hamstrings and back, and limited bilateral upper extremity range of motion especially with overhead movements.  (*Id.*)

Bobo attended at least eleven (11) aquatic therapy sessions between February and May 2014.  (Tr. 733-750, 719-725, 778, 770-771.)  In February and March 2014, Bobo was noted as presenting with a slow, altered gait and hunched posture, as well as poor/fair core strength, balance, and stability.  (Tr. 749, 745-746, 743-744, 741, 738.)  On March 25, 2014, Bobo stated that "I have pain all the time, but it feels better in the pool."  (Tr. 733.)  During that visit, the therapist noted some improvement in posture.  (Tr. 733-734.)  Two days later, on March 27, 2014, Bobo indicated "I always have pain when I'm on land."  (Tr. 724.)  The therapist noted Bobo was "able to maintain good posture and upright position in non-weight bearing environment" and indicated Bobo's goals were "partially achieved."  (Tr. 725-726.)

On April 1, 2014, Bobo presented with "less altered gait and improved posture."  (Tr. 722.)  He demonstrated fair/good core strength and balance with occasional unsteadiness.  (*Id.*)

7

On April 3, 2014, the therapist noted improved balance, stability, and flexibility while standing and with ambulation.  (Tr. 720.)  Bobo was noted as displaying good effort and "modified independence."  (*Id*.)  On April 21, 2014, Bobo was able to execute his aquatic home exercise program with "minimal difficulty" and voiced no complaints during or at the end of the session.  (Tr. 715.)  On May 5, 2014, however, Bobo arrived ambulating with a "moderately altered gait and visual display of pain."  (Tr. 771.)  On May 12, 2014, the therapist noted Bobo had completed his aquatic therapy sessions and achieved his goals in upper and lower extremity movement, dynamic lumbar stabilization, and balance.  (Tr. 770.)

Meanwhile, on May 5, 2014, Bobo underwent a physical therapy consultation to perform a TENS trial.  (Tr. 773-778.)  Bobo reported lower back pain radiating to his bilateral legs and feet; and neck pain with radiation to his bilateral upper extremities.  (Tr. 774.)  Treatment notes indicate a TENS trial was requested "due to failure to improve symptoms with multiple different [treatment] methods."  (*Id*.)  Bobo reported "a couple falls last month due to legs giving out" and indicated he used a "cane most of the time."  (*Id*.)  He stated prolonged activity increased his pain, while aquatic therapy and use of a heating pad decreased his pain.  (*Id*.)  Examination revealed moderately limited lumbar range of motion and 4/5 strength in Bobo's bilateral lower extremities.  (Tr. 775-776.)  With regard to Bobo's posture, the therapist noted Bobo "stands with shoulders in front of his hips, . . . demonstrates increased forward head posture, rounded shoulders, and decreased lumbar lordosis and forward flexed posture."  (Tr. 776.)  He ambulated with a standard cane but no balance deficits were observed.  (*Id*.)  The therapist noted an "antalgic gait, decreased step length, slow cadence, and decreased heel-strike."  (*Id.*)  Bobo verbalized a decrease in lower back and lower extremity pain with application of the TENS unit

8

and was discontinued from physical therapy.  (*Id.*)

After an eight month gap in treatment, Bobo presented for follow-up care on March 11, 2015.  (Tr. 836-840.)  He complained of continuing back pain and "significant" numbness/tingling in his legs.  (Tr. 836.)  Bobo reported the TENS unit was "helpful at times," but his pain medication was "only mildly effective."  (*Id.*)  He requested a new back brace.  (*Id.*)  On examination, Bobo had a normal gait and walked unassisted.  (Tr. 837.)  Bobo was advised to increase his Gabapentin dosage, and continue his other medications.  (Tr. 838.)  His treatment provider ordered a new back brace and referred him to a chiropractor for a consult.  (*Id.*)

On April 8, 2015, Bobo began treatment with chiropractor Anthony Battaglia.  (Tr. 828-831.)  He complained of (1) low back pain with numbness and tingling in his legs, right worse than left; and (2) neck pain with bilateral numbness and tingling of the first through third digits of his hands.  (Tr. 828.)  Bobo indicated his lower back was "worse with standing and walking a lot," and his "neck pain has been gradually getting worse."  (Tr. 828-829.)  Examination of Bobo's lumbar spine revealed (1) severely limited range of motion and guarding in all planes with right sided low back pain; (2) positive straight leg tension bilaterally for low back pain and leg pain both supine and seated; (3) difficulty walking heel to toe due to pain; and (4) diminished deep tendon reflexes, +1/4 lower extremities.  (Tr. 830.)  Examination of Bobo's cervical spine revealed (1) moderately limited range of motion in all planes with increased neck pain; (2) positive compression tests bilaterally; (3) positive distraction test; (4) hypertonic cervical and dorsal spinal muscles with pain on palpation; and (4) positive Phalen's bilaterally.  (*Id.*)

Dr. Battaglia assessed multilevel cervical degenerative disc disease; L4-L5 disc herniation; lumbar spondylosis; and "suspected carpal tunnel syndrome."  (Tr. 830-831.)  He

9

noted Bobo had difficulty laying on the examination table without increased pain in his lower back.  (Tr. 831.)  He also experienced difficulty performing simple flexion based exercises when in a supine posture.  (*Id*.)  Dr. Battaglia ordered Bobo a new back brace and advised him to return in two to three weeks.  (*Id*.)

Bobo returned to Dr. Battaglia on May 20, 2015.  (Tr. 825-826.)  During this visit, he presented with a back brace and walked with a cane.  (Tr. 826.)  Bobo rated his lower back pain an 8 on a scale of 10, and his neck pain a 6 on a scale of 10.  (Tr. 825.)  Examination revealed severely reduced lumbar range of motion with pain, positive Kemp's bilaterally, and reduced cervical range of motion.  (Tr. 826.)  Dr. Battaglia noted he was unable to treat Bobo due to his discomfort and inability to lay on the treatment table in a prone position.  (*Id.*)

On June 17, 2015, Bobo returned to Dr. Battaglia with complaints of continued lower back and neck pain.  (Tr. 822-823.)  Examination again revealed severely limited lumbar range of motion and guarding in all planes with right sided low back pain; positive straight leg tension both supine and seated; moderately limited cervical range of motion in all planes with increased neck pain; and positive compression tests bilaterally.  (Tr. 823.)  Dr. Battaglia noted some difficulty working with Bobo due to his inability to lay on the treatment table, but stated he was eventually able to perform some flexion distraction and soft tissue mobilization.  (*Id*.)  Bobo reported minimal relief.  (*Id*.)  Bobo raised the possibility of surgery, but Dr. Battaglia indicated he did not think Bobo was a good candidate.  (*Id*.)

Bobo returned to Dr. Moss on July 7, 2015.  (Tr. 820-821.)  Bobo reported no significant improvement after chiropractic treatment, and Dr. Moss stated "the patient has evidently convinced himself that he requires surgery on his back."  (*Id*.)  Dr. Moss explained he had

previously recommended aqua therapy and provided a list of free indoor pools, but Bobo reported only going to the pool once or twice a month. (*Id.*) Dr. Moss also noted Bobo had been given home exercises, which "again he doesn't completely follow." (*Id.*) He stated Bobo's major complaint was muscle spasms and severe pain in the muscles post spasm, that radiates into his right leg greater than his left. (*Id.*) Bobo also continued to complain of a popping sensation in his neck with radiating pain into his shoulders and upper arms. (*Id.*) Bobo indicated his cervical pain was "less intense" than his low back pain and did not interfere with his ability to ambulate using a cane in his right hand. (*Id.*)

On examination, Bobo ambulated very slowly with a cane and transferred with difficulty from the chair to the exam table. (*Id.*) There was marked tenderness to palpation of the lumbar musculature; positive straight leg raise bilaterally; and intact sensation. (*Id.*) Dr. Moss noted Bobo "was screaming in pain and I had to roll [him] onto his side and palpated his paravertebral musculature again and found spasm where there was previous marked tenderness." (*Id.*) Dr. Moss then explained as follows:

> I had a detailed discussion with the patient. I have explained to him that I do not feel that chiropractic treatment is going to be beneficial to him. I reviewed his medications. He is taking baclofen. The rest of his medications were appropriate and I had no recommendation to change them.
>
> I tried to get him to understand that his lack of any exercise is causing much of his pain and disability. I strongly advised him to go at least 3-4 times a week for aqua therapy at a nearby indoor pool. I also suggested that he tried to do the stretching and floor based exercises when he cannot go to the pool.
>
> I have explained to the patient that he is not a surgical candidate. If anything surgery would make him considerably worse because it would lead to more muscle deconditioning in the postoperative period. Unless he significantly improves his muscle conditioning through aqua therapy or land-based exercise, his prognosis at best remains guarded. I did suggest to the patient that he consider seeing the pain management psychologists for possible relaxation therapy,

11

biofeedback, and to help him gain better insight into his role in both the causation and treatment of his pain.  The patient was not receptive.  I did not give the patient a return appointment.  Other than continuing [his] current medications, there is very little that I have to offer.

(Tr. 821.)

## C.   State Agency Reports

On December 20, 2013, state agency physician Gerald Klyop, M.D., reviewed Bobo's

medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.

(Tr. 91-92.)  Dr. Klyop adopted the RFC set forth in the previous ALJ decision dated July 2,

2013, explaining as follows:

The RFC given is an adoption of the ALJ RFC dated 7/3/13.  The RFC is being adopted under AR 98-4 (Drummond Ruling).

The claimant has the residual functional capacity to perform Light work as defined in 20 CFR 404.1567(b)[4] with the following additional limitations: can stand/walk four hours of an eight hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; is not limited in the ability to balance; can occasionally stoop, crawl; frequently kneel and crouch; must avoid all exposure to hazards.

(*Id.*)

On March 6, 2014, state agency physician Michael Delphia, M.D., reviewed Bobo's

---

[4]  "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some  pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

12

medical records and completed a Physical RFC Assessment.  (Tr. 103.)  Like Dr. Klyop, Dr. Delphia adopted the RFC set forth in the previous ALJ decision dated July 2, 2013 (set forth above).  (*Id*.)

On May 9, 2014, Paul Steurer, M.D., examined Bobo as part of a VA Pension and Compensation determination.  (Tr. 760-769.)  Dr. Steurer identified diagnoses of lumbosacral sprain and degenerative arthritis of the spine.  (Tr. 761.)  Describing the history of Bobo's back condition, Dr. Steurer indicated it was "worsening with time" and included "leg pain and paresthesias."  (*Id*.)  He noted Bobo regularly used a cane, brace, and TENS unit.  (Tr. 768.)  On examination, Dr. Steurer noted restricted range of motion, lumbar spinal tenderness, guarding of the thoracolumbar spine resulting in abnormal gait, positive straight leg raising bilaterally, and radicular pain.  (Tr. 762-764.)  However, he also found normal strength in Bobo's hips, knees, ankles and great toe; no muscle atrophy; normal deep tendon reflexes; and normal sensation in Bobo's thighs, knees, lower legs, ankles, and feet/toes.  (Tr. 765-766.)  Dr. Steurer characterized the severity of Bobo's lower extremity pain, paresthesias, numbness, and radiculopathy as mild. (Tr. 766-767.)

Dr. Steurer concluded Bobo was limited to sedentary work.  (Tr. 769.)  He explained his findings as follows:

> It is my medical  opinion  that it is more likely than not  (greater than 50/50 probability) that pain, but not weakness, fatigability or incoordination, could significantly limit functional ability during flare-ups, or when the joint is used repeatedly over a period of time and that there is additional limitation due to pain with change in the baseline range of motion due to "pain on use or during flare-ups."  It would be pure speculation to state what additional ROM loss would be present due to pain on use or during flare-ups since the veteran is not examined during flare-up.

(*Id*.)

13

D.    **Hearing Testimony**

During the July 29, 2015 hearing, Bobo testified to the following:

- He has a high school diploma and attended college for one year.  (Tr. 43-44.)
  He lives alone.  (Tr. 42.)

- He cannot work because his legs give out on him and he experiences "sharp pain
  shooting down both his back legs to his toes."  (Tr. 34, 39.)  He suffers from
  back pain due to the fact he has seven herniated discs, four of which are bulging.
  (Tr. 36.)  He experiences back spasms three to four times per week, each of
  which last an "hour or two."  (Tr. 41.)  He also experiences tingling in his arms
  and legs, and numbness in his hands.  (Tr. 34, 39.)   He has a reconstructed
  pelvis and a pin in his ankle.  (Tr. 36.)

- He uses a cane to help maintain his balance when his legs give out.  (Tr. 39.)
  His primary care doctor prescribed the cane two years ago.  (Tr. 38-39.)  He has
  not fallen since he started using a cane.  (Tr. 39.)

- He takes Naproxen, Tramadol, Baclofen, and Gabapentin for his back pain.  (Tr.
  38.)  These medications do not provide much relief.  (*Id.*)  He has had injections
  in the past but they only provided relief for about seven days and "then the pain
  intensified."  (Tr. 37.)  He uses a back brace and TENS unit, and does home
  exercises.  (Tr. 34, 41-42.)  His pain management doctor told him he is not a
  good candidate for surgery.  (Tr. 37.)

- He has tingling and numbness in both hands.  (Tr. 39.)   He particularly has
  trouble using his thumbs and the first two fingers bilaterally.  (Tr. 40.)  Because
  of the tingling and numbness in his hands, he has trouble holding and using a
  screwdriver and opening a jar.  (Tr. 39-40.)

- He can lift no more than 10 pounds.  (Tr. 40, 42.)  He can stand for 30 to 45
  minutes, and sit for one to two hours.  (Tr. 42.)  He can walk the length of about
  eight houses before needing to sit down.  (*Id.*)

- He can do most household chores independently, with breaks.  (Tr. 43.)  He
  washes and folds his clothes, vacuums, mops, makes the bed, cleans the
  bathroom, and goes grocery shopping.  (*Id*.)

The ALJ noted Bobo had past work as a laser printer operator (semiskilled, light); print

shop helper (semiskilled, medium); and maintenance housekeeping cleaner (unskilled, light).

(Tr. 35.)  The ALJ then posed the following hypothetical question:

14

I want you to assume an individual similar to the Claimant in age, education, and work history who can engage in light exertion but is limited to standing and walking four hours in an eight hour day.  This individual should never climb any ladders, ropes or scaffolds.  This individual can occasionally climb ramps and stairs.  Is not limited in his ability to balance, but can occasionally stoop and crawl and frequently kneel and crouch and must avoid all hazards.  As you review this hypothetical individual, can you tell me whether or not there is any work consistent with the Claimant's past work that could still be performed?

(Tr. 52-53.)

The VE testified the hypothetical individual would not be able to perform Bobo's past work as a laser printer operator, print shop helper, or maintenance housekeeping cleaner.  (Tr. 53.)  However, the VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier II (SVP 2, light); information clerk (SVP 2, light); and ticket seller (SVP 2, light).  (Tr. 53-54.)

The ALJ then asked a second hypothetical that was the same as the first but added the limitation to occasional bilateral overhead reaching.  (Tr. 54.)  The VE testified the hypothetical individual would be able to perform the previously identified jobs of cashier II, information clerk, and ticket seller.  (*Id.*)

The ALJ then asked a third hypothetical that added a limitation to occasional bilateral "forceful pinching and twisting, torqueing action.  (Tr. 54-55.)  The VE again testified the hypothetical individual would be able to perform the previously identified jobs.  (Tr. 55.)

The ALJ then asked a fourth hypothetical that added the limitation that the individual would be off task 10% of the workday due to any symptom or combination of symptoms from his medically determinable impairments.  (Tr. 55.)  The VE explained the individual would be able to perform the previously identified jobs if off task 10% of the workday, but not 20% of the workday.  (*Id.*)

15

Bobo's attorney then asked the VE the following questions:

Q:      If the person were required or needed the use of a cane, in your opinion how would that impact ability to perform the jobs provided?

\* \* \*

A:      If he needs a cane while he's standing, depending on the amount of standing that's required for these positions, he would not be able to perform the job.  In my experience an information clerk and a ticket seller does not stand, they're usually seated, so that would not impact his ability to do that job.

Q:       . . . [D]oes the RFC get reduced to that of a sedentary capacity with the addition of a cane?

A:      Those positions are listed as light.  It could be that the lifting that's required for the positions or it could be that if they are listed as light, some could be performed standing.  In my experience, I haven't seen a ticket taker stand, they're usually seated.  So the cashier I would say that I had seen cashiers that have to stand and in that case he would not be able to perform that job.

Q:      So . . . if we added the use of a cane to the original hypothetical question . . . . in your opinion would the available jobs that a person could perform with all of those limitations be that of just sedentary because they could not perform the required standing with the cane?

A:      If they can't – if the job requires standing then yes, he would not be able to perform the work because he would needs his hands free to do that.

(Tr. 56-57.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

16

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Bobo was insured on his alleged disability onset date, July 3, 2013, and remained

17

insured through March 31, 2015, his date last insured ("DLI.")  (Tr. 10-11.)  Therefore, in order

to be entitled to POD and DIB, Bobo must establish a continuous twelve month period of

disability commencing between these dates.  Any discontinuity in the twelve month period

precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant last met the insured status requirements of the Social Security
Act on March 31, 2015.

2.      The claimant did not engage in substantial gainful activity during the period
from his alleged onset date of July 3, 2013 through his date last insured of
March 31, 2015 (20 CFR 404.1571 *et seq.*)

3.      Through the date last insured, the claimant had the following severe
impairments: degenerative disc disease of the cervical and lumbar regions of
the spine (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or
combination of impairments that met or medically equaled the severity of one
of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20
CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that,
through the date last insured, the claimant had the residual functional
capacity to perform light work as defined in 20 CFR 404.1567(b).  However,
the claimant can only stand/walk four hours of an eight hour workday.  He
can never climb ladders, ropes or scaffolds.  He may only occasionally climb
ramps and stairs. He is not limited in the ability to balance but can only
occasionally stoop and crawl.  He can frequently kneel and crouch.  He must
avoid all hazards.  He can tolerate occasional overhead reaching bilaterally.
He can tolerate occasional forceful pinching, twisting, and torqueing action
bilaterally.

6.      Through the date last insured, the claimant was unable to perform any past
relevant work (20 CFR 404.1565).

7.      The claimant was born on June ** 1964 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from July 3, 2013, the alleged onset date, through March 31, 2015, the date last insured (20 CFR 404.1520(g)).

(Tr. 10-21.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does

not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Drummond*

In his first assignment of error, Bobo argues the ALJ misapplied *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) in adopting the RFC set forth in the previous ALJ decision.  (Doc. No. 11 at 12-18.)  He maintains the objective medical evidence and physical examination findings demonstrate a worsening of his cervical and lumbar impairments since the previous decision.  (*Id.*)  In addition, Bobo asserts Dr. Steurer's May 2014 consultative orthopedic examination constitutes "evidence of changing circumstances," as Dr. Steurer found Bobo's condition had worsened over time and limited him to sedentary work.  (*Id.*)  Finally, Bobo argues the opinions of state agency physicians Drs. Klyop and Delphia do not provide substantial evidence in support of the ALJ's decision because those opinions were "highly conclusory" and failed to consider "much of the evidence" from Drs. Moss, Battaglia, and Steurer.  (*Id.*)

The Commissioner argues substantial evidence supports the ALJ's determination there was no new and material evidence demonstrating a worsening of Bobo's physical impairments.

21

(Doc. No. 12 at 7-13.)  She maintains Bobo has not shown that recent imaging of his lumbar and cervical spines or physical examination findings reflect a worsening of his underlying conditions.  (*Id*.)  The Commissioner also maintains Bobo's conservative treatment history and improvement with aquatic therapy support the ALJ's finding that his condition did not significantly worsen during the relevant time period.  (*Id*.)  Finally, the Commissioner argues the ALJ gave several "sound reasons" for according little weight to Dr. Steurer's opinion, and reasonably relied on the opinions of Drs. Klyop and Delphia in adopting the previous ALJ's RFC determination.  (*Id*.)

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d at 842 (relying on *Senters v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).  *See also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015).  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at 839.  After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition.  *Id*. at 841–842.  "Just as a social security claimant is

barred from relitigating an issue that has been previously determined, so is the Commissioner."

*Id*.

In response to *Drummond*, the Social Security Administration promulgated

Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level.  It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> **When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding** or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

As the Sixth Circuit recently explained, "[r]ead together, *Drummond* and Acquiescence

Ruling 98–4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings

of a prior ALJ unless the claimant presents new and material evidence that there has been either

a change in the law or a change in the claimant's condition." *Blankenship*, 624 Fed. Appx. at

425.  "New" evidence is evidence " 'not in existence or available to the claimant at the time of

the administrative proceeding that might have changed the outcome of that proceeding.' "

*Schmiedebusch v. Comm'r of Soc. Sec.*, 2013 WL 5749156 at * 9 (6th Cir. Oct. 24, 2013)

(quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)).

With regard to materiality, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988). *See also Schiedebusch*, 2013 WL 5749156 at * 9; *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-1233 (6th Cir. 1993) (where the Secretary already denied a claimant's application for one period, the claimant must then show that "her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity"); *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988 at * 8 (E.D. Mich. July 12, 2011) (a claimant must present new evidence showing "that his condition deteriorated from the state of his condition at the time the ALJ made the decision.").

Here, Bobo filed his first application for POD and DIB in January 2012, alleging disability since January 1, 2012. (Tr. 71.) In a written decision dated July 2, 2013, an ALJ considered the medical evidence regarding Bobo's physical impairments. (Tr. 71-83.) Based on this evidence, as well as the opinion evidence, the ALJ determined Bobo had the severe impairment of degenerative disc disease. (Tr. 73.) After concluding at step three that Bobo physical impairments did not meet or equal the criteria for Listing 1.04, the ALJ summarized Bobo's physical symptoms and self-reported limitations as follows:

> The claimant originally alleged disability due to back problems (Exhibit 2E). At the hearing, the claimant alleged that surgery was recommended for his back impairment, but he is afraid to go through with it. He alleges that he experiences pain every day and that standing too long can exacerbate his pain. The claimant also indicated that he experiences tingling in his first three fingers. He alleges that he has to lie down fifteen to twenty minutes a day and can only walk the length of seven houses to the bus stop. He also is only able to stand thirty minutes. The claimant also alleged at the hearing that his legs give out twice a week. In a comfortable chair, the claimant can sit forty-five minutes. He is able to lift ten to fifteen pounds. The claimant testified that he is able to

help his wife with household chores such as washing dishes and clothes.

(Tr. 75.)  The ALJ found, however, that Bobo's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible."  (*Id*.)  In reaching this conclusion, the ALJ acknowledged MRIs of Bobo's cervical spine from 2003 and 2004 showing various degenerative changes including (1) marked canal stenosis with deformity of the cervical cord due to disc bulge and end plate spurring at the C4-5 and C5-6 levels; (2) moderate canal stenosis at C3-4 level; and (3) disc herniations at the C4-5 and C5-6 level with canal and foraminal stenosis.  (Tr. 75.)  The ALJ also acknowledged MRIs of Bobo's lumbar spine showing (1) multilevel disc herniations most pronounced at the L4-5 level in 2004; (2) severe disco-osteophyte bulging and bilateral severe neuroforaminal and moderate central canal stenosis in 2012; and (3) a focal annular tear with disc herniation and disc material indenting the exiting left-sided nerve root at the L4-5 level, mild central canal compromise at the L3-4 level and neural foramen compromise at the L1-2 level in 2013.  (Tr. 75-76.)

The ALJ also discussed numerous physical examination findings in the record, including abnormal findings such as limited lumbar range of motion, lower lumbar paraspinal tenderness, positive facet loading, lumbar instability, cervical radiculopathy, weakness of the hip musculature, and muscle spasm.  (Tr. 75-76.)  However, the ALJ emphasized that Bobo improved with physical therapy, citing treatment records showing increased range of motion, decreased muscle spasm, and increased postural awareness.  (*Id*.)  The ALJ observed that "[d]espite recommendations by treating sources to continue with physical therapy, the claimant has not been consistent with attending therapy" and had not been "completely compliant with treatment."  (Tr. 76.)  She also noted that "while the evidence of record documents some

worsening on imaging, the claimant has improved clinically with treatment."  (*Id.*)

With regard to the opinion evidence, the ALJ first noted "the record does not contain any opinions from treating or examining physician indicating that the claimant is disabled or even has limitations greater than those determined in this decision."  (Tr. 77.)  The ALJ gave "great weight" to the opinion of state agency record-reviewing physician Uma Gupta, M.D., that Bobo was limited to a reduced range of light work, finding Dr. Gupta's opinion was "consistent with the weight of the objective evidence of record, as well as the consistent subjective reports." (*Id.*)  The ALJ then assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations:   can stand/walk four hours of an eight-hour workday, never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, is not limited in the ability to balance, can occasionally stoop and crawl, frequently kneel and crouch, and must avoid all exposure to hazards.

(Tr. 74.)

Based on the testimony of the VE, the ALJ concluded Bobo could not perform his past relevant work but could perform other jobs in the national economy such as unskilled light data entry clerk, unskilled light housekeeping cleaner, and unskilled light mail clerk.  (Tr. 78-79.) Accordingly, the ALJ determined Bobo "has not been under a disability, as defined in the Social Security act, from January 1, 2012, through the date of this decision."  (Tr. 79.)  Bobo did not appeal this decision.  (Tr. 10.)

Bobo filed his second application for POD and DIB in October 2013, alleging a disability onset date of July 3, 2013 (the date after the previous ALJ's decision).  (Tr. 10.)  At the outset, the ALJ acknowledged the previous ALJ decision and found as follows:

26

The record shows a prior ALJ decision dated July 2, 2013, which is now final as the claimant failed to appeal the same requested within the proscribed period. (See Ex. B IA).  AR98-4(6), adopted as a consequence of the 6th Circuit Court of Appeal's decision in *Drummond*, specifically instructs: when adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

The claimant has offered new evidence incident to the within application and appeal.  However, this is not in and of itself sufficient to disregard *Drummond*.  In fact, that new and material evidence must document a <u>significant</u> change in a claimant's condition. For the reasons discussed below, the claimant has failed to show a significant change in his condition either  physically or mentally through the entirety of updated medical evidence.

Accordingly, the undersigned adopts the prior ALJ's findings regarding the claimant's residual functional capacity (AR 98-4(6)).  The undersigned also adopts the prior ALJ's findings relative to the demands of the claimant's past relevant work (AR 98-3(6)) and other work available in the regional/national economy.

(Tr. 10-11) (emphasis in original).  The ALJ then found Bobo suffered from the severe

impairments of degenerative disc disease of the cervical and lumbar regions of the spine.  (Tr.

13.)  The ALJ determined Bobo's impairments, considered singly and in combination, did not

meet or equal the requirements of Listing 1.04.  (Tr. 13-14.)

The decision then goes on, at step four, to discuss Bobo's self-reported symptoms and

limitations, as well as the medical evidence regarding his physical impairments.  (Tr. 15-18.)

The ALJ first acknowledged that Bobo alleged "worsening of his spinal degeneration since July

2, 2013" and "some progression in the deterioration of his lumbar and cervical spines."  (Tr. 15.)

The ALJ also noted Bobo's complaints of tingling in his bilateral arms and hands, decreased

sensation, and impaired gait requiring the use of a cane.  (*Id*.)  The decision then recounts the

medical evidence before the previous ALJ, including imaging showing "significant degenerative changes in the cervical and lumbar spine regions" and "medically documented instances of lumbar tenderness/instability/spasm, weakness of the hip musculature, and bilateral cervical radiculopathy."  (Tr. 16.)  The ALJ determined, however, that "the claimant has failed to produce objective evidence in connection with his current application establishing deterioration in his physical conditions that would warrant imposing additional physical limitations," explaining as follows:

> Treatment notes covering the period at issue do reflect subjective complaints and presentations that align with the symptoms and limitations reflected in the claimant's hearing testimony.  (See Exs. B1F/9, 23, 28, 91-92; B6F/3; B7F/3; B8F/1; B9F/18; B1OF/21, 24-26; and Bl lF/20, 43). However, the claimant' s treating physicians have consistently responded to his extreme complaints and presentations with recommendations to pursue conservative symptom management measures.  These conservative treatment recommendations are actually consistent with the diagnostic imaging studies in evidence, which only reflect mild to moderate degenerative changes in the cervical and lumbar spine. (See Exs. B2F/2 and B4F/31-33).
>
> Further, there are no electrodiagnostic studies in evidence confirming the presence of the neuromuscular abnormalities that could reasonably explain the extremity numbness alleged by the claimant.  Nor are there any medical source statements in evidence affirming the claimant's use of a cane to be medically necessary.  These factors significantly erode the reliability of the claimant's subjective complaints and subjective presentations.
>
> Additionally, the claimant's aquatic therapy notes reflect significant improvement in the claimant's overall functioning within twelve months of the alleged onset date.  As of early April 2014, the claimant exhibited a less altered gait and improved posture. (Ex. B9F/11). By late April 2014, the claimant was able to execute his aquatic home exercise program without difficulty and had no complaints during or after his aquatic therapy session. (Ex. B9F/4).  As of mid-May 2014, the claimant had met all of his aquatic therapy goals in upper and lower extremity movement, dynamic lumbar stabilization, and balance. (Ex. B10F/20).  At this point, his most recent physical examination revealed slightly decreased strength in the lower extremities, moderately limited range of motion in the lumbar spine, and normal balance. (Ex. B10F/25-26).

28

* * *

Treatment notes covering the period of March 2015 going forward document the return of extreme subjective presentations with complaints of treatment inefficacy.  (See Exs. and B11F/20, 27, 29, 32, 37, 43).  However, March 2015 physical examination notes show the claimant walking unassisted with a normal gait. (Ex. B11F/44).  At this point, he was caring for his wife who had recently undergone open-heart surgery. (Ex. B11F/43).  His treating physicians continued recommending conservative pain management measures, including a TENS unit, home exercises, and standard doses of medication.

Further, in July 2015, Dr. Kenneth Moss, a treating pain management specialist, advised the claimant that much of his pain and disability was caused by his lack of exercise.  (Ex. B11F/28). Dr. Moss further advised the claimant that he was not a surgical candidate.  (Ex. B11F/28).  Dr. Moss recommended the claimant continue taking his prescribed medications and consider consulting with a pain management psychologist for possible relaxation therapy and biofeedback.  Dr. Moss felt consulting with a pain management psychologist would help the claimant gain better insight into his role in both the causation and treatment of his pain.

As a whole this evidence supports a reasonable inference that the claimant's symptoms have presented at work limiting levels for a period of twelve months after the alleged onset date.  The undersigned finds it reasonable that the claimant's spinal degeneration could limit him to the lifting/carrying demands of light work.  The undersigned has accounted for the medically documented instances of reduced range of motion with restrictions in overhead reaching and postural movements known to exacerbate musculoskeletal pain.  The undersigned has also accounted for the mild extremity numbness/tingling with restrictions in manipulation and exposure to hazards.  The claimant has failed to produce objective support for his alleged limitations in standing/walking.

(Tr. 16-18.)  As for the opinion evidence, the ALJ considered Dr. Steurer's May 2014 opinion that Bobo was limited to sedentary work but rejected it on the grounds it (1) was speculative and "largely based on [Bobo's] subjective presentations; (2) conflicted with the "improved ambulatory abilities reflected in [Bobo's] aquatic therapy notes;" and (3) conflicted with the relatively normal examination findings recorded by Dr. Steurer during the examination.  (Tr. 17-18.)  The ALJ accorded "great weight" to the opinions of state agency physicians Drs. Klyop and Delphia "because they are consistent with the remaining physical abilities reflected in the

29

collective subjective reporting and physical examination findings in evidence." (Tr. 18.)

The ALJ adopted the RFC set forth in the previous ALJ decision with the additional limitations that Bobo can tolerate occasional overhead reaching bilaterally and occasional forceful pinching, twisting, and torqueing action bilaterally. (Tr. 14-15.)

The Court finds the ALJ's determination there was no new and material evidence demonstrating a worsening of Bobo's physical impairments is supported by substantial evidence. As the instant ALJ noted, Bobo's physical examination findings, treatment regimen, and the objective medical evidence remained generally consistent with his previous application. The physical examination findings before the instant ALJ document Bobo's continued complaints of chronic pain in his lumbar and cervical spines, as well as numbness/tingling in his bilateral hands and fingers. These pain complaints were acknowledged and discussed by both the previous and the instant ALJ. Like the treatment records before the previous ALJ, Bobo's physical examination findings consistently included abnormal findings, such as pain, limited range of motion, difficulty ambulating, and muscle spasms. However, as the ALJ correctly noted, Bobo's treatment records often contained normal findings. For example, Dr. Moss noted normal motor strength, and only minimal to mild tenderness in July 2013 and January 2014. (Tr. 526-527, 704-705.) In May 2014, consultative examiner Dr. Steurer found normal strength in Bobo's hips, knees, ankles and great toes; no muscle atrophy; normal deep tendon reflexes; and normal sensation in Bobo's lower extremities. (Tr. 765-766.) At that time, Dr. Steurer characterized the severity of Bobo's lower extremity radicular pain, paresthesias, numbness, and radiculopathy as mild. (Tr. 766-767.) In March 2015 (after an eight month gap in treatment), Bobo presented for treatment with a normal gait and was able to walk unassisted. (Tr. 837.)

30

Further, the ALJ correctly observed Bobo's aqua therapy notes reflected significant improvement in his overall functioning.  (Tr. 17.)  When Bobo began aqua therapy in February 2014, he presented with a slow, altered gait and hunched posture, as well as poor/fair core strength, balance, and stability.  (Tr. 749, 745-746, 743-744, 741, 738.)  By April 2014, however, Bobo had achieved improved posture, gait, core strength, balance, stability, and flexibility.  (Tr. 722, 720.)  By May 2014, Bobo's physical therapist noted he had completed his aquatic therapy sessions and achieved his goals in upper and lower extremity movement, dynamic lumbar stabilization, and balance.  (Tr. 770.)  Bobo's improvement with therapy provides additional support for the ALJ's conclusion that his lumbar and cervical conditions had not significantly worsened since the previous ALJ decision.

Moreover, Bobo's treatment regimen and response to treatment was largely similar to his previous application.  The previous ALJ noted Bobo was treated with medication, referred to physical therapy, and had been placed on a trial of cane ambulation.  (Tr. 75-76.)  Bobo improved with physical therapy, showing increased range of motion, decreased muscle spasm, and increased awareness.  (*Id*.)  The previous ALJ remarked, however, that "[d]espite recommendations by treating sources to continue with physical therapy, the claimant has not been consistent with attending therapy" and has "not been completely compliant with treatment." (Tr. 76.)

Similarly, the instant ALJ found Bobo's "treating physicians have consistently responded to his extreme complaints and presentations with recommendations to pursue conservative management measures," such as medication, aquatic therapy, home exercises, and a TENS unit.  (Tr. 16-17.)  Moreover, like the previously adjudicated period, Bobo improved with

31

aquatic therapy but then failed to continue with therapy or home exercises.  (Tr. 17.)  Indeed, as noted *supra*, in July 2015, Dr. Moss explained to Bobo that "his lack of any exercise is causing much of his pain and disability" and advised him "unless he significantly improves his muscle conditioning through aqua therapy or land-based exercise, his prognosis at best remains guarded."  (Tr. 821.)  At that visit, Dr. Moss declined to adjust Bobo's medications and did not give him a return appointment, noting "other than continuing his current medications, there is very little that I have to offer." [5] (*Id*.)

With regard to the objective medical evidence, the lumbar and cervical MRIs before both ALJs showed similar degenerative changes.  Specifically, the 2003 MRI of Bobo's cervical spine discussed by the previous ALJ showed marked canal stenosis with deformity of the cervical cord due to disc bulge and end plate spurring at the C4-C5 and C5-C6 levels, as well as moderate canal stenosis at the C3-4 level.[6]  (Tr. 75.)  The October 2013 cervical MRI before the instant ALJ showed similar degenerative changes, including disc bulging and osteophytes resulting in mild canal compromise at the C3-4 and C5-6 levels, mild to moderate neural foramen compromise at C4-5, mild to moderate neural foramen compromise at C5-C6, moderate

---

[5] Bobo notes that, during the relevant time period, he underwent injections "which had not been performed earlier."  (Doc. No. 11 at 14.)  Bobo also notes that treatment notes consistently reflect that he walked with a cane.  (*Id*.)  The Court finds evidence that Bobo underwent steroid injections is insufficient, standing alone, to demonstrate a worsening in Bobo's lumbar and cervical impairments.  Moreover, with regard to Bobo's use of a cane, the instant ALJ noted there were no "medical source statements in evidence affirming the claimant's use of a cane to be medically necessary."  (Tr. 17.)  Bobo does not direct this Court's attention to any medical evidence in the record demonstrating  a treating source prescribed a cane.

[6] Another cervical MRI before the previous ALJ, performed in 2004, also demonstrated disc herniations at the C4-5 and C5-6 levels with canal and foraminal stenosis.  (*Id*.)

to severe canal compromise at C4-5, and moderate to severe neural foramen compromise at C6-C7.  (Tr. 635.)

With regard to Bobo's lumbar spine, the 2004, 2012, and 2013 MRIs before the previous ALJ documented various degenerative changes, including multilevel disc herniations and bulging discs causing mild central canal compromise at L3-L4 with moderate bilateral neural compromise; mild right, moderate left neural foramen compromise at L1-L2; and moderate to severe left neural compromise at L4-L5.[7]  (Tr. 75-76, 673.)  Bobo does not direct this Court's attention to any subsequent imaging of his lumbar spine newly presented to the instant ALJ that demonstrated a worsening of his lumbar degenerative disc disease.

In sum, while the objective evidence regarding Bobo's lumbar and cervical spines contain concerning findings, Bobo has not shown that the MRIs before the instant ALJ demonstrate a significant worsening of his physical impairments as compared to the imaging before the previous ALJ.

Bobo nonetheless argues "evidence of changing conditions exists through Dr. Steurer's orthopedic examination . . . in May 2014."  (Doc. No. 11 at 15.)  Dr. Steurer indicated Bobo's back condition was "worsening with time" and found "it is more likely than not (greater than 50/50 probability) that pain, but not weakness, fatigability, or incoordination, could significantly limit functional ability during flare-ups, or when the joint is used repeatedly over a period of time."  (Tr. 769.)  He concluded Bobo was limited to sedentary work.  (*Id.*)

Bobo appears to argue the instant ALJ erred in discounting Dr. Steurer's opinion.  In

---

[7] The previous ALJ characterized a January 2012 MRI of Bobo's lumbar spine as showing severe disco-osteophytic bulging, bilateral severe neuroforaminal and moderate central canal stenosis, and minimal spondylolisthesis.  (Tr. 76.)

formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings" made by State agency medical or psychological consultants, or other program physicians or psychologists.  20 C.F.R. § 404.1513a(b)(1).  *See also* 20 C.F.R § 404.1527(e).  Because "our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings and opinions.  *Id.* When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertises, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

The Court finds the ALJ properly discounted Dr. Steurer's opinion that Bobo was limited to sedentary work.  As set forth above, the ALJ acknowledged Dr.  Steurer's opinion and articulated several reasons for discounting it.  The ALJ's reasons are supported by substantial evidence.  As the ALJ corrected noted, Dr. Steurer's physical examination findings are not consistent with his opinion that Bobo was restricted to sedentary work.  On examination, Dr. Steurer noted Bobo had (1) normal strength in his hips, knees, ankles and great toes; (2) no muscle atrophy; (3) normal deep tendon reflexes; and (4) normal sensation in his bilateral lower extremities.  (Tr. 765-766.)  In addition, Dr. Steurer characterized the severity of Bobo's lower extremity pain, paresthesia, numbness, and radiculopathy as mild.  (Tr. 766-767.)  The ALJ

34

reasonably concluded these findings (along with Bobo's documented improvement with aqua therapy) were inconsistent with Dr. Steurer's opinion that Bobo was limited to sedentary work and that his pain could "significantly limit functional ability during flare-ups."

Finally, it was not unreasonable for the ALJ to accept the opinions of state agency physicians, Drs. Klyop and Delphia, over the opinion of Dr. Steurer.  It is true Dr. Klyop's December 2013 opinion and Dr. Delphia's March 2014 opinion were rendered well before the ALJ's decision, which was issued September 24, 2015.  However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011).  Rather, the Sixth Circuit requires only "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).  *See also Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 632 (6th Cir. 2016) (stating *Blakley* requires "only that before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record.")

Here, the ALJ expressly addressed evidence post-dating Dr. Klyop's and Dr. Delphia's opinions, including Bobo's aquatic therapy notes, Dr. Steurer's May 2014 consultative examination report, and treatment notes from the period March 2015 forward.  (Tr. 17.)  Indeed, the ALJ specifically references Dr. Battaglia's and Dr. Moss' treatment notes from April through July 2015 (referred to in the ALJ decision as Exh. B11F/20, 27-29, 32, 37, 43.)  Bobo has not

demonstrated the ALJ's assessment of the evidence post-dating the state agency physician

opinions is unreasonable or unsupported by substantial evidence.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err

in determining there was no new or material evidence pertaining to Bobo's physical impairments

during the time period at issue that would necessitate a change from the prior ALJ's RFC.  This

assignment of error is without merit.

### *VE Testimony*

In his second assignment of error, Bobo argues remand is required because the ALJ

failed to ask the VE whether her testimony was consistent with the Dictionary of Occupational

Titles ("DOT"), as required by Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec.

4, 2000).  (Doc. No. 11 at 18-21.)  He maintains the ALJ's failure to make this inquiry is not

harmless error because "the Social Security regulation imposes an affirmative duty on the ALJ to

inquire, particularly where the Commissioner, not Mr. Bobo, bears the burden of proof at step 5

of the sequential evaluation."  (*Id*. at 19-20.)   Bobo further asserts the ALJ's failure to inquire is

not harmless because the VE's testimony, in fact, conflicts with the DOT.  (*Id*. at 20.)

Specifically, Bobo argues the jobs of cashier II and information clerk both require "frequent"

reaching and the job of ticket seller requires "constant" reaching, while the hypothetical posed to

the VE and the RFC included limitations to "occasional" overhead reaching bilaterally and

"occasional" forceful pinching, twisting, and torqueing action bilaterally.  (*Id*.)  Bobo argues that

"[b]ecause the ALJ's hypothetical included a limitation that precluded more than occasional

overhead reaching and fingering bilaterally, the ALJ cannot rely on the vocational expert's

testimony to support her conclusion that Mr. Bobo retains the ability to perform work which

exists in significant numbers in the national economy without resolving the apparent conflict." (*Id*. at 21.)

The Commissioner acknowledges the ALJ failed to inquire as to whether the VE's testimony was consistent with the DOT.  (Doc. No. 12 at 14.)  In addition, the Commissioner "concedes that the jobs of cashier II and ticket seller require constant fingering, which is inconsistent with the ALJ's hypothetical question limiting Plaintiff to only occasional forceful pinching."  (*Id*.)  However, citing *Guiterrez v. Colvin*, 844 F.3d 804 (9ᵗʰ Cir. 2016),  the Commissioner argues remand is not required because a close examination of the job requirements for the position of information clerk demonstrates there is no "apparent or obvious" conflict between the VE's testimony and the DOT.  (*Id*. at 16.)  Therefore, the Commissioner asserts, "any failure by the ALJ to inquire about a conflict is harmless error, and the ALJ properly relied on the vocational expert's testimony that Plaintiff could work as an information clerk."  (*Id*.)

Under the fifth step of the sequential evaluation, ALJs are permitted to consider "'reliable job information' available from various publications" as evidence of the claimant's ability to do other work "that exists in the national economy."  SSR 00–4p, 2000 WL 1898704 at *2 (Dec. 4, 2000) (citing 20 C.F.R. §§ 404.1566(d) and 416.966(d)).  Such publications include the DOT, which provides "information about jobs (classified by their exertional and skill requirements) that exist in the national economy."  20 C.F.R. § 416.969.  ALJs are also authorized to consider the testimony of vocational experts as a source of occupational evidence. S.S.R. 00–4p, 2000 WL 1898704 at *2.  *See also Lindsley v. Comm'r of Soc. Sec*., 560 F.3d 601, 603 (6ᵗʰ Cir. 2009).

SSR 00–4p sets forth "the actions required of an ALJ when there is an apparent conflict between the testimony of the vocational expert and the DOT."  *Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 374 (6th Cir. 2006).  In pertinent part, SSR 00–4p provides:

> [B]efore relying on VE . . . evidence to support a disability determination or
> decision, our adjudicators must:  Identify and obtain a reasonable explanation
> for any conflicts between the occupational evidence provided by the VEs . . .
> and information in the [DOT], including its companion publication, the Selected
> Characteristics of Occupations...and Explain in the determination or decision
> how any conflict that has been identified was resolved.

SSR 00–4p, 2000 WL 1898704 at *1 (SSA Dec. 4, 2000).  Significantly, SSR 00–4p imposes an "affirmative responsibility" on ALJs to ask about any possible conflicts between the VE testimony and information provided in the DOT.  *See* S.S.R. 00–4p, 2000 WL 1898704, at *2, *4; ("[VE testimony] should be consistent with the occupational information supplied by the DOT...the adjudicator will inquire, on the record, as to whether or not there is such consistency.").  *See also Lindsley*, 560 F.3d at 606.  Neither the testimony of a VE nor the occupational descriptions in the DOT necessarily trumps the other.  *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir. 2008).  However, if there appears to be a conflict with the DOT, the ALJ must obtain a "reasonable explanation" for the apparent conflict and, further, must "explain in the determination or decision how he or she resolved the conflict."  SSR 00-4p, 2000 WL 1898704 at * 4.  SSR holdings "are binding on all components of the Social Security Administration [and] represent precedent final opinions and orders and statements of policy and interpretations that [have been] adopted."  20 C.F.R. § 402.35(b)(1).  *See also Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 573-574 (6th Cir. 2007).

Here, it is undisputed that, at the hearing, the ALJ did not ask whether the VE's opinions were consistent with the DOT and, if not, whether there was a reasonable explanation

38

for the conflict.  However, "a violation of SSR 00-4p does not automatically require remand." *Harrington v. Comm'r of Soc. Sec.*, 2015 WL 5308245 at * 7 (N.D. Ohio Sept. 10, 2015).  *See also Miller v. Comm'r of Soc. Sec.*, 2012 WL 398650 at * 15 (N.D. Ohio Feb. 7, 2012); *Bratton v. Astrue*, 2010 WL 2901856 at * 4 (M.D. Tenn. July 19, 2010); *Fleeks v. Comm'r of Soc. Sec.*, 2009 WL 2143768 at * 7 (E.D. Mich. July 13, 2009).  Rather, an ALJ's failure to inquire about consistency with the DOT may constitute harmless error where there is no conflict between the VE's testimony and the DOT.  *See Joyce v. Comm'r of Soc. Sec.*, 662 Fed. Appx 430, 436 (6th Cir. 2016) ("[A]n ALJ's failure to inquire about a nonexistent conflict is necessarily harmless ...."); *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx 498, 508 (6th Cir. 2013) (citing *Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir. 2009) ("finding 'the ALJ's error in not inquiring about potential conflicts [to be] harmless' where no conflicts existed between the VE's testimony and the DOT's job descriptions")).  *See also Smith v. Berryhill*, 2017 WL 1196519 at * 11 (M.D. Tenn. March 31, 2017) ("However, the ALJ's failure to make such an inquiry was harmless as Plaintiff fails to show an actual conflict between the VE's testimony and the DOT."); *Waulk v. Comm'r of Soc. Sec.*, 2016 WL 7438718 at * 3 (S.D. Ohio Dec. 27, 2016) *report and recommendation adopted by* 2017 WL 131928 (S.D. Ohio Jan. 13, 2017); *Bennett v. Comm'r of Soc. Sec.*, 2016 WL 7395795 at * 6 (N.D. Ohio Dec. 2, 2016) ("[U]nless the VE's testimony actually conflicts with the DOT, such error is harmless.") *report and recommendation adopted by* 2016 WL 7396707 (N.D. Ohio Dec. 21, 2016); *Baldwin v. Comm'r of Soc. Sec.*,  2015 WL 4540436 at *4–5 (S.D. Ohio Feb. 24, 2015); *Kerr v. Comm'r of Soc. Sec.*, 2014 WL 4243771 at *3 (S.D. Ohio Aug. 26, 2014) ("[W]here the Plaintiff fails to demonstrate an actual conflict, courts have consistently held that an ALJ's failure to comply with SSR 00–4p's inquiry

39

requirement constitutes harmless error."); *Goulette v. Comm'r of Soc. Sec.*, 2013 WL 2371695 at

* 11 (E. D. Mich. May 30, 2013) (stating that "the courts in this circuit have generally concluded

that the ALJ's failure to inquire about consistency with the DOT is not reversible error unless a

potential conflict actually exists.")

For the following reasons, the Court finds the ALJ's failure to ask the VE about

possible conflicts between the VE's testimony and the DOT is not harmless error because a

conflict exists between the VE's testimony and the DOT with respect to all three of the jobs

identified by the VE.  At the hearing, the VE testified that an individual with Bobo's vocational

background and limitations consistent with the RFC could perform work as a cashier II (DOT

211.462-010), information clerk (DOT 237.367-018), and ticket seller (DOT 211.467-030).  (Tr.

53-55.)  As noted *supra,* it is undisputed the ALJ did not inquire whether the VE's testimony in

this regard was consistent with the DOT.  Bobo asserts, and the Commissioner concedes (Doc.

No. 12 at 14), that the jobs of cashier II and ticket seller require constant fingering, which is

inconsistent with the ALJ's hypothetical question limiting Bobo to only occasional forceful

pinching.  Thus, the Commissioner acknowledges "those jobs should have been excluded from

consideration."  (Doc. No. 12 at 14.)

The only remaining job identified by the VE, then, is the information clerk position.

Bobo asserts there is a conflict with respect to this position because the DOT's companion

volume, Selected Characteristics of Occupations ("SCO"), classifies the information clerk

position (DOT 237.367-018) as requiring "frequent" reaching.  *See* SCO at p. 336.  "Frequent" is

defined in the SCO as an activity or condition that exists from 1/3 to 2/3 of the time, and

"reaching" is defined as "extending hand(s) or arm(s) in any direction."  SCO at C-3.  *See also*

*Bennett*, 2016 WL 7395795 at * 6.  Thus, under the SCO, frequent reaching includes reaching

overhead for up to 2/3 of the workday.  *Bennett,* 2016 WL 7395795 at * 6.  The hypothetical

posed to the VE, and the RFC ultimately adopted by the ALJ, however, included the limitation

that the individual can only *occasionally* (i.e., up to 1/3 of the time) perform overhead reaching

bilaterally.

      The Court agrees with Bobo that there is an apparent conflict between the VE's

testimony and the DOT relating to the information clerk position.  Indeed, as another court

within this District recently explained:

> Most courts analyzing this issue have found a potential or apparent conflict
> between a DOT job description requiring frequent reaching and a claimant's
> limitation of no overhead reaching or occasional reaching with one arm.  *See*
> *Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015) (remanding case due, in
> part, to apparent conflict between VE testimony and DOT–DOT listed three jobs
> as requiring frequent reaching but ALJ found that claimant could only
> occasionally reach upward with nondominant arm); *Prochaska v. Barnhart*, 454
> F.3d 731, 736 (7th Cir. 2006) (remanding the case due to the potential
> inconsistency between a limitation that claimant could only "occasionally reach
> above shoulder level" with the DOT requirement that the cashier's job required
> frequent reaching); *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir.
> 2014) (finding a conflict between DOT job listing requiring constant reaching and
> RFC limitation that claimant could reach overhead only occasionally); *Jones v.*
> *Colvin*, No. 4:15–CV–00072–F, 2016 WL 4491764, at *2 (E.D.N.C. Aug. 26,
> 2016) (found conflict between RFC restriction of no overhead reaching with left
> arm and DOT requirement that housekeeping job includes frequent reaching);
> *Marquez v. Astrue*, No. CV–11–339–TUC–JGZ–DT, 2012 WL 3011778, at *3
> (D. Ariz. May 2, 2012), report and recommendation adopted, No. CV
> 11–339–TUC–JGZ, 2012 WL 3011779 (D. Ariz. July 23, 2012) (finding a
> conflict between VE testimony that claimant limited in overhead reaching can
> perform particular jobs requiring frequent reaching in any direction.); *Jordan v.*
> *Astrue*, No. 09–CV1559–MMA, 2010 WL 2816234 (S.D.Cal. May 4, 2010)
> (finding conflict between VE testimony, that claimant limited to occasional
> overhead reaching with right shoulder could perform particular jobs, and DOT
> descriptions that jobs required frequent reaching); *Silvera v. Astrue*, No.
> CV–09–1935–JC, 2010 WL 3001619 (C.D.Cal. July 29, 2010) (finding that
> frequent reaching requirement in the DOT description potentially conflicts with
> claimant's restriction to perform only occasional overhead reaching because DOT

>does not distinguish overhead from other reaching); *Robertson v. Astrue*, No.
>1:09CV87–SRW, 2010 WL 3488637, at *3 (M.D. Ala. Aug. 31, 2010); *Beeler v.
>Astrue*, No. 2:09–CV–649–GZS, 2010 WL 4791836, at *4 (D. Me. Nov. 17,
>2010), aff'd, No. 09–CV–649–P–S, 2010 WL 5070889 (D. Me. Dec. 7, 2010)
>(DOT jobs requiring occasional reaching were inconsistent with a limitation of no
>overhead work with right arm) . . .

*Bennett*, 2016 WL 7395795 at * 6.  *See also Lamear v. Berryhill*, 865 F.3d 1201 (9th Cir. 2017)

(remanding where ALJ failed to reconcile conflict between the DOT and VE testimony that a

person limited to occasional overhead reaching with his left upper extremity and occasional

handling and fingering with his left hand could perform jobs involving frequent handling and

fingering).  Despite this apparent conflict, the ALJ in the instant case failed to either obtain a

"reasonable explanation" for the conflict during the hearing or "explain in the determination or

decision how he or she resolved the conflict," as required by SSR 00-4p.[8]  Under these

circumstances, the Court finds the ALJ's error is not harmless and remand is required.

 The Commissioner's argument to the contrary is without merit.  In support of this

argument, the Commissioner relies principally on *Guiterrez v. Colvin*, 844 F.3d 804 (9th Cir.

2016).  In that case, the ALJ posed a hypothetical to the VE that included a limitation to no

overhead reaching with the right arm.  *Id*. at 807.  The VE testified the hypothetical individual

could work as a cashier.  *Id*.  The ALJ then specifically asked the VE if his opinion was

consistent with the description of cashiering set forth in the DOT, and the expert confirmed that

it was.  *Id*.  After considering all of the evidence, the ALJ determined that, although Gutierrez

---

[8] In the decision, the ALJ states, summarily, that "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocation expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  (Tr. 21.)  However, the ALJ does not explain the basis for this conclusion at any point in the decision, nor did she address the issue during the hearing.

had some restrictions to her right arm (including the inability to reach above shoulder level), she could successfully adjust to work as a cashier and was not disabled.  *Id.*

On appeal, Guiterrez argued there was a conflict between the VE's testimony and the DOT because the DOT specifies that cashiers must engage in frequent reaching.  She maintained the ALJ erred in failing to ask the VE "more specific questions" regarding her ability to perform the cashiering job given her inability to reach overhead with her right arm.  The Ninth Circuit rejected this argument, finding "the ALJ didn't err because there was no apparent or obvious conflict between the expert's testimony that Ms. Gutierrez could perform as a cashier, despite her weight bearing and overhead reaching limitations with her right arm, and the Dictionary's general statement that cashiering requires frequent reaching."  *Id.*  The Court noted that, while reaching connotes the ability to extend one's hands and arms in any direction, "not every job that involves reaching requires the ability to reach overhead."  *Id*. at 808.  The Court found that "anyone who's made at trip to the corner grocery stores knows that while a clerk stocking shelves has to reach overhead frequently, the typical cashier never has to."  *Id.*  Because the frequency or necessity of overhead reaching was unlikely and unforeseeable in a typical cashier position, the Court found the ALJ did not have an obligation to ask the VE "follow up questions" regarding a possible conflict.  *Id*.

*Guiterrez* is distinguishable from the instant case.  In *Guiterrez*, the ALJ expressly asked the VE if his testimony was consistent with the DOT and the VE confirmed that it was.  Thus, the ALJ in that case complied with his affirmative duty under social security regulations to ask about possible conflicts between the VE testimony and information provided in the DOT. *See* S.S.R. 00–4p, 2000 WL 1898704, at *4 ("When a VE . . . provides evidence about the

43

requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE . . . evidence and information provided in the DOT.").  Under these circumstances, the Ninth Circuit found that, because there was no apparent or obvious conflict, the ALJ was not under a *further* obligation to ask additional follow-up questions regarding possible conflicts relating to Gutierrez's inability to reach overhead with her right arm.[9]

In the instant case, however, the ALJ failed to satisfy her affirmative responsibility under SSR 00-4p to ask the VE regarding possible conflicts between her expert testimony and the DOT.  Moreover, as discussed above, there is an actual or potential conflict between the VE testimony and the DOT relating to the all three of the jobs identified by the VE, including the information clerk position.  Under social security regulations, the ALJ herein had an obligation to ask about potential or apparent conflicts, obtain a reasonable explanation, resolve the conflicts, and then "explain in the determination or decision how he or she resolved the conflict."  SSR 00-4p at * 4.  The ALJ failed to do so here.  Faced with similar circumstances, district courts within this Circuit have remanded for further proceedings to resolve conflicts between VE testimony and the DOT.  *See e.g., Bennett*, 2016 WL 7395795 at * 5-7; *Waulk*, 2016 WL 7438718 at * 3-4; *Sprouse v. Colvin*, 2016 WL 6078296 at * 5-7 (W.D. Ky. Oct. 14,

---

[9] The Sixth Circuit has also found that, where a VE credibly testifies that there is no conflict between his or her testimony and the DOT, an ALJ has "no duty under SSR 00-4p to interrogate him further."  *Lindsley*, 560 F.3d at 606.  *See also Beinlich v. Comm'r of Soc. Sec.,* 345 Fed. Appx. 163, 168 (6th Cir. 2009) ("As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00–4p.");  *Martin*, 170 Fed. Appx. at 374 ("Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.")

2016); *Goulette*, 2013 WL 2371695 at * 10-13; *Teverbaugh v. Comm'r of Soc. Sec.*, 258 F.Supp.2d 702, 705 (E.D. Mich. 2003).

Ultimately, the VE may agree with the Commissioner that there is no overhead reaching involved in the information clerk position.[10]  However, that is not for this Court to decide.  More explanation is needed before the Court can determine if the ALJ decision on this issue is supported by substantial evidence.  *See e.g, Waulk*, 2016 WL 7438718 at * 3-4; *Sprouse*, 2016 WL 6078296 at * 7.  *See also Pearson*, 810 F.3d at 211 ("Although we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert as to whether these occupations do, in fact, require frequent bilateral overhead reaching.") Since the ALJ did not make the inquiry required by SSR 00-4p, and because the error is not harmless, it is recommended the case be remanded for further proceedings on this issue.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

---

[10] Citing the DOT's job description for the information clerk position, the Commissioner argues that "it would be uncommon for an information clerk to reach overhead."  (Doc. No. 12 at 16.)  The DOT job description for this position, however, does not directly address this issue.  The ALJ should have made this determination by eliciting a reasonable explanation from the VE, resolving the conflict, and then providing an explanation during the hearing or in the decision.

Date: September 21, 2017

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**